Westlaw.

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

Only the Westlaw citation is currently available.

United States District Court, M.D. Florida,
Jacksonville Division.
Sarah H. **BOHR**, Plaintiff,
v.
FIRST AMERICAN TITLE INSURANCE COM-
PANY, Defendant.
Sarah H. **Bohr**, Plaintiff,
v.
Old Republic National Title Insurance Company,
etc., Defendant.
**Nos. 3:07-cv-741-J-32MCR, 3:07-cv-745-J-32HTS.**

July 30, 2008.

Howard L. Dale, Dale, William A. Bald, Bald, Show-
later, Mercier & Green, PA, Jacksonville, FL, for
Plaintiff.

Ernst A. Bell, Foley & Lardner, LLP, Christopher M.
Garrett, Cristine M. Russell, Jacob Justin Payne,
Joseph Stroud, Jr., Jacksonville, FL, for Defendant.

### ORDER

TIMOTHY J. CORRIGAN, District Judge.

**\*1** Before the Court are two related title insurance
cases, consolidated for purposes of cross motions for
partial summary judgment.[FN1] The parties ask the
Court to determine the proper method for measuring
damages under an owner's title policy insuring a con-
dominium unit.[FN2] The question is whether, on these
facts, plaintiff can utilize principles of "assemblage"
in arriving at the "diminution in value" of the insured
condominium unit caused by the title defect.

> FN1. *See* Case No. 3:07-cv-741-J-32MCR
> Docs. 16, 17; Case No. 3:07-cv-745-J-
> 32HTS Docs. 17, 18. The Court considers
> Plaintiff's Motion For Partial Summary
> Judgment (3:07-cv-741 Doc. 20; 3:07-cv-
> 745 Doc. 20); Defendant First American Ti-
> tle Insurance Company's Motion For Partial
> Summary Judgment (3:07-cv-741 Doc. 22);
> Old Republic's Motion For Partial Summary

Judgment (3:07-cv-745 Doc. 21); the parties'
responses to the motions (3:07-cv-741 Docs.
24, 26; 3:07-cv-745 Docs. 22, 24); their ex-
hibits and submissions; and argument of
counsel at a hearing conducted on May 19,
2008 (3:07-cv-741 Doc. 28; 3:07-cv-745
Doc. 26), the record of which is incorpo-
rated.

> FN2. The parties requested this procedure at
> a preliminary pretrial conference, framing
> the issue as a legal one for the Court to de-
> cide. (3:07-cv-741 Doc. 16; 3:07-cv-745
> Doc. 17.)

**I.** *Undisputed Facts*

On April 27, 2006, Plaintiff Sarah H. Bohr ("Bohr")
purchased two units (Unit A and Unit B) of a three-
unit condominium building known as Bluffs Cluster
Homes Condominium, paying $1.1 million for each
unit.[FN3] The condominium building is located in
Seminole Beach, Florida, on 1.34 acres of real prop-
erty with 150 feet of frontage on the Atlantic Ocean.
Bohr has owned Unit C of the same condominium
building since 1995, having purchased that unit for
$140,000.[FN4] The title to Unit C is insured by Stew-
art Title, not a party to these actions. As a result of
the 2006 purchases, Bohr now owns the entire Bluffs
Cluster condominium building along with all of the
land and appurtenances. The building, originally a
single-family home built in 1961, is shaped like a
"T". It was converted into a three-unit condominium
in 1979. Units B and C form the top of the "T", being
the easternmost units stretching along the oceanfront
running north and south, with Unit B located to the
north and Unit C lying to the south. They are 1,075
square feet and 1,163 square feet respectively. Unit A
is the westernmost unit, forming the base of the "T."
It is not oceanfront and is approximately 1,502 square
feet. The 1,465 square foot swimming pool and con-
crete pool deck wrap around the southern and west-
ern walls of Unit C. Title to each unit includes an
undivided interest in the common elements of the
condominium property, including the swimming pool
and deck.

> FN3. The 2006 real estate assessment for

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

property tax purposes was $374,500 for Unit A and $125,042 for Unit B. (3:07-cv-741 Doc. 20; 3:07-cv-745 Doc. 20 (Cantrell Report at 12).) The current "just (market)" and assessed value, according to the county property appraiser, for Unit A is $1,012,000 and for Unit B is $860,000. (3:07-cv-741 Docs. 22-9, 22-11.) On May 4, 2006, Sun-trust Mortgage, Inc. recorded a mortgage for Unit A in the amount of $833,000, and on May 9, 2006, Suntrust recorded a mortgage for Unit B in the amount of $833,000. (*Id.* Docs. 22-10, 22-12.)

FN4. Unit C's "just (market) value" according to the Duval County Property Appraiser is now $790,925. (3:07-cv-741 Doc. 22-2.) On May 1, 2006, Suntrust recorded a mort-gage for Unit C in the amount of $833,000. (*Id.* at 22-8.)

Bohr obtained title insurance coverage from defen-dant First American Title Insurance Company ("First American") for Unit A, and from defendant Old Re-public National Title Insurance Company ("Old Re-public") for Unit B. Each policy provides a policy limit of $1.1 million. Each policy excepted from cov-erage a 40-year easement recorded on February 15, 1979 which gave owners of fifteen nearby town homes the right to use the swimming pool and pool deck on the insured condominium property, and which terminates when the pool ceases to be used but no later than 2019 ("Pool Easement"). A subsequent April 23, 1979 recorded modification to the Pool Easement ("Modification") which made the Pool Easement perpetual was not excepted from coverage.

The parties do not dispute that all three title insurance companies failed to identify and except from cover-age the Modification, which encumber all three con-dominium units, and which Bohr discovered shortly after closing on Units A and B. Bohr filed a separate lawsuit against each of the three title insurance com-panies, claiming the failure to discover the Modifica-tion thwarted her plan to redevelop the property. First American and Old Republic removed their respective cases to federal court; the third case against Stewart Title concerning Unit C remains pending in state court.

**\*2** The Complaints before this Court are virtually identical. Count I of each complaint is for breach of contract. Bohr alleges that "[b]y virtue of the Modifi-cation, Plaintiff has sustained or incurred loss or damage under the Title Policy," (Doc. 2 at 3 (Com-plaint ¶ 14)), and that "[o]n the Date of Discovery, the difference between the value of the insured estate as insured and the value of the insured estate subject to the Modification was in excess of $530,000" for each unit. (*Id.* ¶ 18.) Plaintiff seeks recovery "for damages, plus interest, attorney's fees, court costs and such other relief as the Court deems just and proper." (*Id.* at 4.)[FN5]

FN5. Count II of the complaints allege neg-ligent performance of contractual duties. De-fendants each moved to dismiss Count II based upon the Florida economic loss rule which bars a tort action where defendant has not committed a breach of duty apart from a breach of contract. *Indemnity Ins. Co. of N. American v. American Aviation, Inc.,* 891 So.2d 532, 537 (Fla.2004). Bohr responded that she was unopposed to the motions and the Court dismissed Count II of plaintiff's complaints with prejudice.

**A.** *Title Insurance Policies*[FN6]

FN6. The Policies are based upon the Stan-dard Conditions and Stipulations of the 1992 American Land Title Association (ATLA) Owner's Title Insurance Policy, with Florida modifications. The operative language of the policies is identical in every material re-spect.

The face page of each policy states that the policy

insures ... against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sus-tained or incurred by the insured by reason of:

...

2. Any defect in or lien or encumbrance on the title.

The policies state that they insure Bohr's fee simple estate and describe "[t]he land referred to in this policy" as

Condominium Unit A, BLUFFS CLUSTER

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

HOMES, A CONDOMINIUM, ... together with an undivided 1/3rd interest in all common elements appurtenant thereto. [First American Policy]

Unit No. "B", BLUFFS CLUSTER HOMES, a condominium, ... together with an undivided interest in the common elements appurtenant thereto. [Old Republic Policy]

The policies define "land" in the Conditions and Stipulations as follows:
(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.[FN7]

> FN7. The Condominium Endorsement included in the Old Republic Policy states that the policy
>
> insures against loss or damage by reason of:
>
> (1) The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

Of key importance here is the policy provision entitled "Determination, Extent of Liability" found at Paragraph 7 of the Conditions and Stipulations in both policies, which provides:

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described:

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A [$1.1 million], or,

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy....

**B. *The Expert Appraisals***

In asking the Court to determine the proper methodology for ascertaining Bohr's damages, the parties agreed to submit reports prepared by their respective expert appraisers.

**\*3** Bohr has submitted reports by appraiser Heyward Cantrell appraising Unit A and Unit B and the undivided interests in common elements sold with them. To determine the value of Units A and B with and without the Modification, Cantrell determined market value, based upon the "highest and best use" of the insured properties. Cantrell stated that "Highest and Best use must be reasonable, probable, and proximate;" that the "Highest and Best Use is the foundation upon which market value rests;" and that the "highest and best use" may or may not be the present use of the site. (3:07cv0741 Doc. 20 (Cantrell Report at 23).) Cantrell concluded that the highest and best use of each insured unit is:

assemblage of the three units under single ownership, demolition of the improvements, dissolve the articles of incorporation and homeowners' association, and subdivision of the site into two 75-foot wide oceanfront lots.[FN8]

> FN8. Allegedly, this was Bohr's plan when she purchased the remaining two condominium units.

(*Id.* at 6.) Under this scenario, in which the existing condominium building is leveled to make way for two oceanfront lots, the Pool Easement prevents the southern portion of the assembled property from being sold immediately as an oceanfront lot, although the northern lot could be sold as a 75-foot oceanfront lot. The southern lot encumbered by the Pool Easement could be held as a non-oceanfront lot with an ocean view until the Pool Easement expired in 2019.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

However, if the Pool Easement continues into perpetuity (as required by the Modification), then the southern lot would remain an "ocean view" lot with a "community" pool, and redevelopment would be limited to the westernmost area of the subdivided lot. (*Id.* at 6-7.)

Cantrell appraised the loss resulting from the insured-against Modification as the difference between the value of the southern lot that could be sold either immediately or in 2019 as a 75-foot oceanfront lot, and the value of a lot that in perpetuity can only be sold as a 75-foot non-oceanfront lot with an ocean view. He stated that "the diminution in value to the assemblage is the proper measure of the diminution in value to each individual unit (because each unit is essential to the assemblage)." (3:07-cv-741 Doc. 25 at 2.) Using this methodology and based on an analysis of comparable sales, Cantrell opined that the present value of the total loss to Bohr as a result of the Modification, considering the entire assembled property, is $1,526,400 if the Pool Easement terminates in 2019, and $1,691,750 if the Pool Easement could be terminated immediately.[FN9] Then, Cantrell opined that "it is reasonable to assign the diminution in value to the assemblage equally to each of the three condominium units in Bluffs Cluster Condominium, which would yield a diminution in value of Unit A ranging from $508,800 to $563,916.67 and a diminution of value of Unit B in the same range." (3:07-741 Doc. 25 at 2 (Cantrell Affidavit ¶ 6).)

> [FN9.] Apparently, without the Modification, there is an argument to be made that the Pool Easement could be terminated immediately.

First American's expert appraisers are Ronald Moody and Samuel Rogers. Moody was instructed by counsel for First American to disregard "Ms. Bohr's ownership of the three condominium units or any ability Ms. Bohr may have to develop all three units." (3:07-cv-741 Doc. 22-17 at 11, 21.) Using the comparative data approach, Moody concluded that there was "no significant difference" in the value of Unit A as a result of the Modification. (*Id.* at 15 (Moody Report at 9).) Appraiser Rogers assigned Unit A's highest and best use as a condominium unit, and used the "income approach" (as opposed to a sales comparison approach) to determine that the estimated loss in value to Unit A as a result of the Modification is

$1,300, comparing the "burden of ownership associated with the "Pool." (3:07-cv-741 Doc. 22-18 at 9.) Rogers opined that the "Highest and Best Use of the Subject Property [Unit A] is almost identical under both 'easement' scenarios." (*Id.* at 10.)

**\*4** Old Republic's expert appraiser Michael Roy (3:07-cv-745 Doc. 21-7), concluded that Unit B was worth $600,000 with or without the Modification, and that the Modification caused no diminution in value to Unit B, based upon his opinion that the highest and best use of Unit B was as a condominium unit because, by itself, Unit B could not be used for any other purpose.

## II. *Discussion*

Each of the parties has moved for partial summary judgment on the issue of the proper methodology to measure damages. In essence, the parties seek an interpretation of the title insurance contract, as further informed by title insurance case law. Sitting in diversity, the Court applies Florida law. However, because of the relative paucity of Florida title insurance damages law, the parties also rely on cases from other jurisdictions. The question is whether in determining the "difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against," principles of assemblage may be considered.

Bohr contends that because "[n]othing in the policies prevents Bohr from recovering damages for the permanent loss of her ability to assemble her three units into two beachfront lots," plaintiff's expert appraiser should be permitted to consider and express opinions based on the fact of Bohr's actual assemblage of the properties, and the measure of Bohr's damages should take into account the damage to the assembled property. Bohr focuses upon the language of the policies which states that the insured may recover the difference in the *value* between the insured properties with and without the Modification defect, which "supports highest and best use as the starting point in evaluating the insured loss." Plaintiff seeks a ruling that would permit "the appraisers to testify on highest and best use, Bohr's completed assemblage, and the effect of potential assemblage on the price that would be paid by a willing buyer to a willing seller."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

Defendants argue that assemblage of the three units may not be considered as a matter of law, that the proper measure of damages is the diminution of the market value of each individual condominium unit, and that "[t]o hold otherwise would make the title insurer the guarantor of the insured's lost profits and failed development plans." (3:07-cv-741 Doc. 22 at 21 (First American).) Specifically, they argue that "[u]nder the terms of the Policy, the diminution in the value of [each unit insured] caused by the Modifications can only be determined by considering the effect of the Modifications on the value of [each Unit individually] by itself and not by reference to the value of Plaintiff's ownership of the entire condominium. This is because the Policy expressly limits coverage to the title to [each Unit individually] and defines the measure of the title insurer's liability with reference to the value of the title 'as insured.' " (3:07-cv-741 Doc. 21 at 7 (Old Republic).) Defendants also contend Bohr's claim is "premature because she has not yet suffered an actual loss; her development plans are a speculative future event, not a current loss which would invoke the necessity for indemnification." (Doc. 22 at 3.) Alternatively, defendants argue that Bohr is improperly seeking consequential damages and that such consequential damages, such as lost profits and damages for delay in use, are not recoverable under the policies.[FN10]

> FN10. Old Republic adds that under its policy, Bohr agreed to a Condominium endorsement which insures plaintiff "against loss or damage by reason of the failure of Unit B to be part of a condominium." (Doc. 21 at 16.) Plaintiff responds that the endorsement grants additional coverage rather than limits liability.
>
> Old Republic also notes that Unit B (the northernmost unit facing the ocean) which it insures, could be re-developed as an "oceanfront" lot even with the Pool Easement remaining in perpetuity pursuant to the Modification, assuming the mortgagees consent to dissolution of the condominiums and plaintiff receives approval to subdivide the lots. (Doc. 21 at 10-11.) These points are beyond the question the Court decides here.

**\*5** The "doctrine of assemblage," which is at the center of this dispute,

> applies when the highest and best use of separate parcels involves their integrated use with lands of another. Pursuant to this doctrine, such prospective use may be properly considered in fixing the value of the property if the joinder of the parcels is reasonably practicable. If applicable, this doctrine allows a property owner to introduce evidence showing that the fair market value of the owner's real estate is enhanced by its probable assemblage with other parcels.

4 Julius L. Sackman, Nichols on Eminent Domain § 13.01[20] (3d ed.2007); *see also Comm'r of Transp. v. Towpath Assocs.,* 255 Conn. 529, 767 A.2d 1169, 1181-82 (Conn.2001); *Clarmar Realty Co. v. Redevelopment Auth. of City of Milwaukee,* 129 Wis.2d 81, 383 N.W.2d 890, 893 (Wisc.1986); *State v. Long,* 344 So.2d 754, 759-60 (Ala.1977); *City of Norwich v. Styx Investors in Norwich, LLC,* 92 Conn.App. 801, 887 A.2d 910, 914 (Conn.App.2006). The basis for the doctrine of assemblage can be found in *Olson v. United States,* 292 U.S. 246, 256, 54 S.Ct. 704, 78 L.Ed. 1236 (1934), a condemnation proceeding, in which the Supreme Court stated "[t]he fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value."

**A.** *The Policies*

As stated, the starting point of the Court's discussion is paragraph 7 of the policies, which limits plaintiff's damages to the "difference between the value" of each condominium unit with and without the undiscovered defect, limited, of course, by the $1.1 million value of the policy.[FN11] While the policies do not define the term "value," all parties acknowledge that the "value" of the unit contemplates its "market value." [FN12] Each policy insured the individual condominium plus the undivided one-third interest in the common elements appurtenant, and did not include "any property beyond the lines of the area described ...." Though defendants correctly argue that the title insurance insures only the individual condominium unit and not the entire condominium property, nothing in the policies prohibits Bohr's expert from considering assemblage for future development when evaluating

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

the "market value" of each condominium unit first with and then without the undiscovered Modification.

> FN11. This presents a question of contract interpretation where resort to extrinsic evidence is not required as paragraph 7 of the Conditions and Stipulations of the policies is unambiguous. *See Bender v. Kansas Secured Title and Abstract Co., 34 Kan.App.2d 399, 119 P.3d 670, 675-76 (Kan.Ct.App.2005)* (identical title insurance limitation of liability provision ruled unambiguous).

> FN12. Experts for plaintiff and defendants have identically defined "market value" in accordance with appraisal standards. Importantly, "market value" is "[t]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." (*See* Doc 20 (Cantrell Report at 8 (citing *Dictionary of Real Estate,* 4th Edition)); Doc. 22-17 (Moody Report at 2 (citing 12 C.F.R. Part 34.42(g))); Doc. 21-7 (Roy Report at 2 (citing *Dictionary of Real Estate Appraisal,* 4th Edition)).)

**B. *Florida Title Insurance Law***

Florida law defines title insurance as "[i]nsurance of owners of real property ... against loss by encumbrance, or defective titles, or invalidity, or adverse claim to title." Fla. Stat. § 624.608(1). In Florida, liability of a title insurer lies in contract. *La Minnesota Riviera, LLC v. Lawyers Title Ins. Corp.,* No. 2:07-cv-77-FtM-29DNF, 2007 WL 3024242, at *2 (M.D.Fla. Oct.15, 2007)* (citing *Chicago Title Ins. Co. v. Commonwealth Forest Investments, Inc.,* 494 F.Supp.2d 1332, 1337-38 (M.D.Fla.2007))*. "A title policy indemnifies rather than guarantees the state of the insured title." *Lawyers Title Ins. Co. v. Synergism One Corp.,* 572 So.2d 517, 518 (Fla. 4th DCA 1990). In the event of a breach of contract, the insured has the burden of establishing the amount of his loss up to the face amount of the policy, which is the upper limit to which the insurer is liable. *Ferrell v. Inter-County Title Guaranty & Mortgage Co.,* 213 So.2d 518, 521 (Fla. 3d DCA 1968); *Fla. Home Ins. Co. v. Braverman,* 163 So.2d 512, 513 (Fla. 3d DCA 1964). "Title defects and liens directly and adversely affect the property owner because the owner is entitled to the full market value of the property and that value is immediately reduced by outstanding title defects and liens." *CMEI, Inc. v. American Title Ins. Co.,* 447 So.2d 427, 428 (Fla. 5th DCA 1984).

**\*6** Florida cases pre-dating the 1992 revision to the Standard Conditions and Stipulations in the 1990/1992 ALTA Owner's Title Insurance Policy (1992 policy) permitted recovery of consequential damages when there was a partial failure of title. *See* Mark A. Brown and Christopher W. Smart, "Are Consequential Damages Recoverable From Title Insurers Or Has There Been A 'Change In Policy'?", 81 Fla. Bar. J. 60 (Oct.2007). In *Safeco Title Ins. Co. v. Reynolds,* 452 So.2d 45 (Fla. 2d DCA 1984), an insured property owner brought suit seeking to recover damages suffered due to the title insurer's failure to disclose the existence of a duly recorded easement and reciprocal parking agreement. The court affirmed the jury's breach of title insurance verdict, but reversed the jury's award of damages for lost profits because plaintiff did not plead special damages, but instead alleged that the error "had a 'substantial negative effect upon the market value' of their property." *Id.* at 47-48 (emphasis omitted). The court noted that " 'an insured ... is entitled to recover the actual loss or damage sustained from a defect, lien or encumbrance affecting his title which was not excepted from the policy's coverage.' " *Id.* (citations omitted). The court said that there were two basic measurements of damages: "(1) diminution in market value ..., and (2) the amount necessary to remove the existing encumbrance." *Id.* at 48.

Recently, in *La Minnesota Riviera, LLC,* 2007 WL 3024242, a judge of this Court denied dismissal of plaintiff's breach of contract claim against a title insurer who failed to except a deed restriction limiting the use of the property to that of a golf course, finding actual damages were available: " '[t]itle defects and liens directly and adversely affect the property owner because the owner is entitled to the full market value of the property and that value is immediately reduced by outstanding title defects and liens.' " *Id.* at *4 (interpreting Florida law and quoting *CMEI, Inc.,* 447 So.2d at 428). Additionally, the court determined that "[l]ost profits may also be recover-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

able." *La Minnesota Riviera, LLC,* 2007 WL 3024242, at *4.

The defendants cite to a 2006 decision by a Florida trial court judge holding that the limitation of liability provision of the standard title insurance policy did not permit recovery of "special damages" under a breach of title insurance policy claim. *Hynes Properties, L.L.C. v. Attorneys' Title Ins. Funds, Inc.,* Case No. 05-2002-CA-011345 (Fla. Cir. Ct., 18th Judicial Circuit, Brevard County, Oct. 26.2006). The *Hynes* court distinguished *Safeco Title Ins. Co.,* stating that in *Safeco* the court "did not address the availability of special damages in a case when the insurer's liability is expressly limited by the terms of the contract." *Hynes,* at 2. The *Safeco* opinion, however, contains *no* reference to the terms of the title insurance policy's liability provisions, and embraces as the measure of damages for partial loss because of an undisclosed encumbrance, the "diminution in market value." 452 So.2d at 48. The *Hynes* court determined that the liability limitation provision was not ambiguous and that the " 'value of the insured estate' clearly means the fair market value of the subject property." *Hynes,* at 4 (citing *CMEI, Inc., supra* ).[FN13]

> FN13. The parties cite to Florida eminent domain and property tax assessment cases for the valuation principle that "fair market value" may not be based upon speculation and conjecture regarding future use of the property, *Fla. Gas Transmission Co. v. Approximately 9.854 Acres Natural Gas Transmission Pipeline Easement,* No. 96-14083-CIV, 2000 WL 33712490, at *11 (S.D.Fla. March 21, 2000); *State Dept. of Transp. v. Target Corp.,* 937 So.2d 703, 706 (Fla. 4th DCA 2006); *City Nat'l Bank of Fla. v. Dade County,* 715 So.2d 350, 352 (Fla. 3d DCA 1998), but rather must be based upon the highest and best use to which the property can be expected to be put in the immediate future, *Gilreath v. Westgate Daytona, Ltd.,* 871 So.2d 961 (Fla. 5th DCA 2004) or for which there was a present market demand. *Holland v. Walker,* 492 So.2d 1093, 1097 (Fla. 4th DCA 1986). These cases are relevant to the extent that they discuss valuation principles related to determining the market value of a property.

*7 Thus, Florida case law confirms that the relevant determination here is the diminution of the market value of each condominium unit caused by the undiscovered title defect. While Florida law addressing the appraisal of "market value," developed primarily in the context of eminent domain and tax assessment cases, requires that the determination of a property's market value and highest and best use may not be speculative or conjectural, it does not prohibit the consideration of the prospective assemblage of the insured property with other properties that is "probable" and "reasonably practicable." [FN14]*See supra* pp. 12-13.

> FN14. Florida law is arguably not clear whether damages allowable under these policies can include consequential damages such as lost profits and damages for delay, "that arise naturally from the breach, or those that were in the contemplation of the parties at the time the contract was made," *Life Investors Ins. Co. of Amer. v. Johnson,* 422 So.2d 32, 34 (Fla. 4th DCA 1982), although there is recent case law which indicates that consequential damages are recoverable. *See La Minnesota Riviera, LLC., supra.* However, the Court need not decide this issue because consideration of a property's "reasonably practicable" and "probable" assemblage with other properties, when considered in context of a "market value" evaluation, does not constitute a "consequential damage."

## C. Cases From Other Jurisdictions

Defendants cite to title insurance cases advising against the award of "consequential" damages such as "loss of use" and "lost profits" or "lost sale" and supporting recovery only for "real loss" of value based upon fact and not upon speculation or possibility. *See Miller v. Ticor Title Ins. Co.,* 194 Or.App. 17, 93 P.3d 88, 90-91 (Or.Ct.App.2004); *Chicago Title Ins. Co. v. Huntington Nat'l Bank,* 87 Ohio St.3d 270, 719 N.E.2d 955, 960 (Ohio 1999); *Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho,* 115 Idaho 56, 764 P.2d 423, 428-29 (Idaho 1988); *Sullivan v. Transamerica Title Ins. Co.,* 35 Colo.App. 312, 532 P.2d 356, 358 (Colo.Ct.App.1975).

Plaintiff relies upon condemnation and tax appraisal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

cases from other jurisdictions which employed the theory of "assemblage" in the valuation of property.[FN15] While not title insurance cases, these case do further define the parameters of the assemblage theory of valuation and provide guidance as to its potential application here. For instance, in *Clarmar Realty Co. v. Redevelopment Auth. of City of Milwaukee,* 129 Wis.2d 81, 383 N.W.2d 890 (Wis.1986), in which the owner of a condemned property being used as a truck terminal brought suit for compensation, the court held that valuation of the condemned property could be based upon its integration with an adjacent parcel, after subtraction of the cost of acquiring that parcel. "The assemblage approach permits a property owner to introduce evidence in a condemnation proceeding that the fair market value of its land is enhanced by its probable assemblage with other parcels." *Id.* at 893 (citations omitted).

> FN15. "Although assemblage analysis is most commonly applied in the area of eminent domain, we note that it also has been employed to value property in other contexts." *Ferrigno v. Cromwell Dev. Assocs.,* 93 Conn.App. 799, 892 A.2d 291, 297 n. 12 (Conn.App.Ct.), *cert. denied,*278 Conn. 903, 896 A.2d 104 (Conn.2006) (citing *Franc v. Bethel Holding Co.,* 73 Conn.App. 114, 807 A.2d 519, 531 (Conn.App.Ct.2002) (noting examples of assemblage being considered in valuation of property for sale, tax assessment and stock valuation purposes)).

We hold that a court may determine the fair market value of a condemned parcel of land in combination with the land of another in a prospective, integrated use if: 1) the prospective use is the "most advantageous use" of the condemned land; 2) the "most advantageous use" of the land can be achieved only through combination with another parcel or parcels; 3) combination with another parcel or parcels is "reasonably probable;" and 4) the prospective, integrated use is not speculative or remote.
*Id.* at 891, 895. *See also Bd. of County Supervisors of Prince William County, Va. v. United States,* 47 Fed. Cl. 714, 719, 721 (2000) (plaintiff seeking just compensation for taking of irregularly shaped piece of land; court applied the general rule that "any attribute of the subject property, that would [a]ffect the price a reasonable buyer would be willing to

pay, should be considered in determining fair market value"; expert appraiser testified that "the highest and best use of the subject property was to assemble it with the surrounding lands, which he further opined was reasonably probable"). Finally, the case *Sakon v. Town of Glastonbury,* No. CV054003783S (SAKON I), CV054006620S (SAKON II), 2007 WL 1321726 (Conn.Super.Ct. April 27, 2007) (unpublished opinion) held that the doctrine of assemblage was a proper element of valuing real estate for tax purposes. In *Sakon,* the property owner already owned adjoining parcels, making assemblage applicable. The court held that the highest and best use of the property was for commercial development upon the assembled property. 2007 WL 1321729, at *5-6.

*8 While the parties cite to no title insurance cases in which assemblage has been expressly considered in determining damages, they each discuss at length the case *American Title Ins. Co. v. East West Financial,* 16 F.3d 449 (1st Cir.1994). In *American Title,* the First Circuit held that under Rhode Island law, the district court did not abuse its discretion when it excluded expert evidence regarding the value of an entire motel proffered by the insured to prove fair market value of individual condominium units in the motel for purposes of supporting the insured's claim under a title policy, notwithstanding the insured's contention that motel was the best use for each unit. In doing so, the court spoke in language that defendants say supports their position here:

Although it might be that the "highest and best" use for the individual condominium units would be as rooms in an operating motel, this is not what was insured. As the district court pointed out, what was insured was "title to and the validity of ... mortgage liens on *individual condominium units."* [Citation omitted.] While it is true that a number of these units were located in the same motel, the insurance was not issued on this basis and did not insure the condominium units as potential rooms in the motel.

*Id.* at 460-61.

However, Bohr takes comfort in the next passage of *American Title,* citing the court's observation:

Bay Loan maintains that the value of the motel is admissible as the "best available evidence" of the

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

value of the individual condominium units. Even though the "proportionate share" motel's value (*i.e.,* the value of the motel divided by the number of individual condominium units), *might* be the best evidence of the value of each unit, it is not necessarily so. *See Allison v. Ticor Title Ins. Co.,* 907 F.2d 6457 (7th Cir.1990). A given unit might be worth more or less than the value of the motel divided by the number of units. *It was Bay Loan's responsibility to introduce evidence as to the value of each unit so that the district court could make a determination of damages. As the record plainly indicates, Bay Loan did not intend to offer any evidence which would connect its expert's opinion on the value of the entire motel, to the value of individual condominium units.* [Footnote omitted.] *Had Bay Loan's expert witness been prepared to testify that, although he could not directly appraise individual units, the proportionate value of the motel was relevant in determining the value of the units, we might be inclined to side with Bay Loan. See Allison v. Ticor Title Ins. Co., 979 F.2d 1187 (7th Cir.1992).*[FN16]

> [FN16.] In *Allison,* also a title insurance case and decided under Wisconsin law, individual unit lessees in a bankrupt condominium resort brought an action against the title insurer for a defect in their title, 979 F.3d at 1197, after sale of the resort was approved in a bankruptcy proceedings. The court determined that the individual lessees were entitled to recover from the title insurer what they "actually lost" calculated from the date the defect in their title was discovered. *Allison,* 979 F.2d at 1197. The court determined that "evidence concerning the lodge's value and certain offers of purchase of the lodge were relevant to the fair market value of the individual leases." *Allison,* 979 F.2d at 1198.

*American Title,* 16 F.3d at 461 (emphasis added).

Upon careful review, the Court finds that *American Title* does not decisively answer the question here as there are procedural and factual dissimilarities from this case. *American Title* does generally support the defendants' position that the title insured was of the individual units and not of the property in the aggregate. However, in *American Title,* the court did not rule out the possibility that the aggregated value of the larger property could be relevant to help determine the fair market value of individual units, assuming proper expert testimony to that effect is presented.

### III. *Decision*

**\*9** Under the policies at issue, damages are limited to the lesser of $1.1 million or "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy." The parties agree that "value" equates to "market value." *See also La Minnesota Riviera, LLC,* 2007 WL 3024242, at *4 (owner is entitled to "full market value" of the property which is immediately reduced by an outstanding title defect) (quoting *CMEI, Inc.,* 447 So.2d at 428). Thus, if the damage to each unit is less than the $1.1 million policy amount, which the parties concur is so, then plaintiff's damages are measured as the diminution in the *market value* of the insured property as a result of the undisclosed defect, the easement Modification.

Further, the parties agree that future contingencies and uses that are feasible, permissible, not speculative, and in accordance with professional appraisal standards, are among the factors that can be considered in determining market value. *See Lawyers Title Ins. Co. v. Novastar Mortgage, Inc.,* 862 So.2d at 793, 797 (Fla. 4th DCA 2003) ("title insurance is protection against future loss because of past events."). In response to a hypothetical from the Court, counsel for Old Republic acknowledged at oral argument that the owner of an oceanfront single-family home who planned to raze the building, resulting in a more valuable cleared oceanfront lot, but whose plans were thwarted by discovery of an undiscovered easement across the lot, would be entitled to seek title insurance damages for diminution in market value premised upon the higher value of the cleared lot without the defect. In fact, the subject property *was* originally a single family home which was divided into three condominium units. Thus, the only difference between the Court's hypothetical and the facts of this case is that assemblage would not be a factor in the valuation of the hypothetical property.

Nevertheless, as Defendants point out, the policies' contractual terms, which limit the measure of dam-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

ages to the difference in value "of the insured estate or interest," require that damages be measured by the diminution in market value of each individual unit insured. Plaintiff proposes a methodology which assembles the three condominium units, Units A, B and C; appraises the assembled property as a whole; considers the diminution in value of the entire lot and condominium building caused by the Modification; and divides that resultant figure by three to assign an identical diminution value to each unit. This approach is beyond the terms of the policies and thus, as a matter of law, is not permissible. The measure of damage in this case is not arrived at by determining the market value of the aggregated property. Rather plaintiff's damages, if any, are limited by the terms of the policies, and thus are measured by the diminution in market value of each individual property insured. Thus, each condominium unit must be appraised separately, and a separate market value ascribed to each unit. The current Cantrell analysis, which does not look at the unique characteristics of each unit individually, and which arrives at an "aggregated diminution" figure and divides by three, is inadmissible.

**\*10** However, even with this contractual limitation, on these specific facts, an expert appraiser would be permitted to consider as part of the expert's determination of diminution in market value of each individual unit, the factor of actual assemblage of the three condominium units. Nothing in the policies or the case law cited or located by the Court prohibits the expert appraiser from considering the recognized doctrine of assemblage as a relevant factor in determining diminution of value so long as it is in the context of appraising each unit individually. *See American Title,* 16 F.3d at 461. Indeed, "any attribute of the subject property, that would [a]ffect the price a reasonable buyer would be willing to pay, should be considered in determining market value." *Bd. of County Supervisors,* 47 Fed. Cl. at 719, 721. This is not to say that use of assemblage is required here, but only that an expert appraiser is not precluded from utilizing it if consistent with proper standards for professional appraisal practice.[FN17] Whether an expert opinion based in part on assemblage is ultimately accepted, especially if there is competing expert testimony, will be up to the finder of fact to decide.

FN17. At oral argument, Bohr's counsel represented that appraisal standards would al-

low consideration of assemblage in this case. At this juncture, the Court expresses no opinion on this issue.

At oral argument, counsel for the title insurers claimed that allowing consideration of assemblage would expose title insurers to substantial extra-contractual and speculative claims risk. The Court disagrees. The dearth of case law on this issue suggests that this case presents relatively unusual facts. Moreover, the Court is at pains not to be making a broad, sweeping general declaration of the measure of damages in title insurance cases but is specifically limiting its decision to these unique facts: The three insured condominium units are all part of the same oceanfront building, which used to be a single family home. Plaintiff already owned one of the units and purchased the other two on the same date to assemble them for development purposes, a use which a jury could find was both "probable" and "reasonably practicable" and was not "speculative" or "remote."[FN18] Plaintiff paid $1.1 million each for Units A and B premised on this "assemblage" scenario. While the title insurers may not have had actual knowledge of plaintiff's development plans, they did insure the units for the $1.1 million sales price (even though Old Republic's expert appraiser now says that Unit B is worth only $600,000 if assemblage is not taken into account). In short, defendants contractually agreed to insure against diminution of value of the condominium units caused by title defects. In this circumstance, assemblage may be a factor in that diminution.

FN18. Courts in some jurisdictions require a unity of ownership of the separate parcels as a prerequisite to applying the doctrine of assemblage. *See Oglethorpe Power Corp. v. Lewis,* 215 Ga.App. 671, 452 S.E.2d 167, 168 (Ga.Ct.App.1994). Inasmuch as Bohr owns all three properties contemplated here for assemblage, the Court need not reach that issue.

Thus, while assemblage is by no means mandated and the defendant title insurers are certainly entitled to try to persuade the factfinder that valuation based on assemblage is unwarranted here, the Court holds that, on these specific facts, neither the language of the respective title insurance policies nor Florida title insurance law precludes consideration of assemblage

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)
**(Cite as: 2008 WL 2977353 (M.D.Fla.))**

in arriving at the diminution in value of the affected individual condominium units.

**\*11** It is hereby

**ORDERED:**

1. All pending motions for partial summary judgment (Case No. 3:07-cv-741 Docs. 20, 22; Case No. 3:07-cv-745 Docs. 20, 21) are **GRANTED IN PART AND DENIED IN PART** consistent with this Order.

2. This Order may cause the parties to ask their experts to revise their reports. A separate Case Management and Scheduling Order, which will give sufficient time for this to occur, will issue. The parties are also asked to report to the Court, no later than **September 2, 2008,** a jointly agreed date for resumption of mediation.

**DONE AND ORDERED.**

M.D.Fla.,2008.
Bohr v. First American Title Ins. Co.
Not Reported in F.Supp.2d, 2008 WL 2977353 (M.D.Fla.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.